**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

**DURETTA J. WILLIS,**

                        **Plaintiff,**                     **1:06-CV-1048**
                                                          **(NAM)**
            **vs.**

**MICHAEL J. ASTRUE**, Commissioner of Social
Security Administration,[1]

                        **Defendant.**

_____

**APPEARANCES:**                            **OF COUNSEL:**


Erwin, McCane & Daly                        Thomas C. Erwin, Esq.
23 Elk Street
Albany, New York 12207
*Attorney For Plaintiff*


Andrew T. Baxter                            Susan Reiss, Esq.
Acting United States Attorney for
the Northern District of New York
P.O. Box 7198
100 South Clinton Street
Syracuse, New York 13261-7198
and
Social Security Administration
Office of Regional General Counsel          Barbara L. Spivak, Esq.
Region II
26 Federal Plaza - Room 3904
**New York, New York 10278**
*Attorneys For Defendant*


**Norman A. Mordue, Chief U.S. District Judge:**

                **MEMORANDUM-DECISION AND ORDER**


**I.      INTRODUCTION**

_____

[1]  Michael J. Astrue became Commissioner of Social Security on February 12, 2007.  Pursuant to Federal
Rule of Civil Procedure 25(d)(1), Michael J. Astrue is substituted as the Defendant in this suit.

In this action, plaintiff Duretta J. Willis, moves, pursuant to 42 U.S.C. § 405(g), for a review of a decision by the Commissioner of Social Security denying plaintiff's applications for disability benefits. (Dkt. No. 1). Presently before the Court are the parties' motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.

## II.      FACTUAL BACKGROUND

Plaintiff was born on March 13, 1954 and was 50 years old at the time of the administrative hearings on July 23, 2004 and October 7, 2004. (Administrative Transcript at p. 19, 58, 406)[2]. At the time of the hearings, plaintiff testified that she resided with a roommate in a first floor apartment. (T. 405). Plaintiff testified that she was separated from her husband and that she had three children and three granddaughters.  (T. 408).  Plaintiff completed 3 ½ years of college with a concentration in social work. (T. 95, 408).  From 1989 until 1999, plaintiff was employed by Anderson Housing Authority as a housing counselor. (T. 121).   Plaintiff's responsibilities included conducting home visits, teaching educational classes and providing financial and home-related counseling for the homeless.  (T. 90, 121-122).

Plaintiff claims that she became disabled on March 30, 1999 after the discovery of an ovarian tumor.[3]  (T. 412).  Plaintiff claims that she became disabled due to an ovarian tumor, depression, multiple hernias and arthritis.  (T. 408).  The last day plaintiff was employed in any capacity was March 30, 1999. (T. 88).

### A.      Medical Evidence[4]

-------

[2] Portions of the administrative transcript, Dkt. No. 5, will be cited herein as "(T. )".

[3] The ALJ noted that the record is devoid of any evidence of any medical problem until March 2000. (T. 20). Plaintiff does not object to that determination.

[4] The record contains treatment notes from doctors and/or facilities for illnesses/conditions that are unrelated to the issues at hand.  A summary of those records has been omitted from this discussion.

On February 24, 2000, plaintiff was examined by Dr. Owen Ukrainetz at Anderson Family Practice Associates for complaints of abdominal discomfort. (T. 185). Dr. Ukrainetz diagnosed plaintiff with a pelvic mass and referred plaintiff for an ultrasound. (T. 185). On February 24, 2000, plaintiff underwent a pelvic ultrasound at St. John's Medical Center. (T. 154). The radiologist noted that plaintiff had a pelvic mass "likely arising from the left ovary". (T. 154). Dr. Ukrainetz referred plaintiff to Dr. Frank L. Meshberger for surgery.[5] (T. 185).

On March 2, 2000, plaintiff was evaluated by Dr. Katherine Look, a gynecological oncologist, at the request of Dr. Meshberger. (T. 163). Dr. Look noted plaintiff had pain when walking, constipation, urinary frequency and an increase in abdominal girth. (T. 163). After an examination, Dr. Look advised plaintiff that the pelvic mass required removal and possibly chemotherapy, if it was malignant. (T. 164).

On March 8, 2000, plaintiff was admitted to Indiana University Medical Center for surgery. (T. 142). Plaintiff underwent a total hysterectomy, bilateral salpingo-oophorectomy and omentectomy which revealed an ovarian tumor.[6] (T. 143). Plaintiff was discharged on March 11, 2000 with a diagnosis of "ovarian tumor of low malignant potential". (T. 143). On March 14, 2000, plaintiff had her staples removed and Dr. Look noted that her postoperative course was unremarkable. (T. 166).

On April 18, 2000, plaintiff returned for a follow-up examination with Dr. Look. (T. 167). Plaintiff stated that she had stopped smoking and returned to work. (T. 167). Dr. Look noted that plaintiff's incision was well healed and plaintiff's examination was "normal". (T. 167).

---

[5] The record does not contain any treatment or office notes by Dr. Meshberger prior to February 2001. The record does not indicate whether or not Dr. Meshberger specialized in any area of medicine.

[6] Salpingo-oophorectomy is surgical removal of a uterine tube and ovary. *Dorland's Illustrated Medical Dictionary,* 1690 (31st ed. 2007). An omentectomy is an excision of all or a portion of the omentum (a fold of peritoneum extending from the stomach to adjacent organs in the abdominal cavity). *Id.* at 1339.

On June 12, 2001, plaintiff returned to Dr. Ukrainetz complaining of depression and stated that "her husband left her last night because of financial problems". (T. 185).   Plaintiff also stated she had been fighting ovarian cancer for one year.  (T. 185).  Upon examination, Dr. Ukrainetz noted plaintiff was tearful but not suicidal.  (T. 185).  Plaintiff had no hallucinations or delusions. (T. 185).  Dr. Ukrainetz diagnosed plaintiff with depression and acute adjustment disorder and prescribed Altivan and Celexa.[7]  (T. 185).

On July 20, 2001, plaintiff returned to Dr. Ukrainetz complaining of abdominal pain, nausea and vomiting. (T. 186).  Dr. Ukrainetz noted plaintiff "appeared unwell" with epigastric tenderness. (T. 186).   Dr. Ukrainetz diagnosed plaintiff with potential pelvic ulcer disease type symptoms and prescribed Nexium and Reglan.[8]  (T. 186).

On July 31, 2001, plaintiff returned for an examination with Dr. Ukrainetz and a "review of her medical problems". (T. 186).  Plaintiff advised that her discomfort improved with the Nexium and Reglan and that she was no longer vomiting blood.  (T. 186).  Plaintiff was "stressed" because her husband was with another woman and her phone and gas service were disrupted. (T. 186).  Upon examination, Dr. Ukrainetz noted plaintiff was non-dysthymic but diagnosed plaintiff with abdominal pain/dyspepsia.[9]  (T. 186).  Dr.  Ukrainetz advised plaintiff to continue with Celexa and Nexium and suggested GI imaging if plaintiff's symptoms did not improve. (T. 186).

---

[7] Ativan is used in the treatment of anxiety disorders. *Dorland's* at 174, 1089. Celexa is an anti-depressant. *Id.* at 317, 372.

[8] Nexium is a proton pump inhibitor used as a gastric acid secretion inhibitor in the treatment of symptomatic gastroesophageal reflux disease. *Dorland's* at 654, 1293. Reglan stimulates gastric motility, used as an antiemetic, as an adjunct in gastrointestinal radiology and intestinal intubation, and in the treatment of gastroparesis and gastroesophageal reflux. *Id.* at 1172, 1644.

[9] Dysthymic is a characterization of symptoms of mild depression. *Dorland's* at 590.  Dyspepsia is impairment of the power or function of digestion.  *Id.* at 586.

On March 12, 2002, plaintiff returned to Dr. Look for management for an incisional hernia. (T. 165). Dr. Look had not examined plaintiff since April 2000. (T. 165). Dr. Look detected one incisional bulge but opined that plaintiff was disease free from her potential tumor of the ovary. (T. 165). Dr. Look suggested surgery but plaintiff advised that she "lost her insurance". (T. 165). Dr. Look arranged for plaintiff to meet with a social worker to identify resources and referred plaintiff to a general surgeon for a herniorrhaphy[10]. (T. 165).

On March 18, 2002, plaintiff returned to Dr. Ukrainetz complaining of pain caused by the hernias. (T. 187). Dr. Ukrainetz prescribed Darvocet and told plaintiff to continue with Celexa.[11] (T. 187).

On September 16, 2002, plaintiff had her last visit with Dr. Ukrainetz. (T. 187). Plaintiff complained of depression and stated that Celexa had caused her side effects. (T. 187). Plaintiff advised that she was in the process of divorcing her husband and had resumed smoking. (T. 187). Plaintiff also noted that she was taking Cenestin.[12] (T. 187). Upon examination, Dr. Ukrainetz noted plaintiff's judgment and insight were mildly dysthymic. (T. 187). Dr. Ukrainetz diagnosed plaintiff with depression and prescribed Effexor.[13] (T. 187).

On October 1, 2002, plaintiff had her last visit with Dr. Look and complained that her appetite was poor. (T. 368). Plaintiff also stated that she had a cough with chest pain. (T. 368). Dr. Look noted that plaintiff's examination did not reveal "anything worrisome". (T. 368). Dr. Look advised plaintiff that surgery was necessary for her hernia. (T. 368). Dr. Look noted that

---

[10] Herniorrhaphy is surgical repair of a hernia. *Id.* at 863.

[11] Darvocet is a mild narcotic analgesics prescribed for the relief of mild to moderate pain, with or without fever. *Dorland's* at 479.

[12] The record does not indicate which physician prescribed Cenestin. Cenestin is a trademark for preparations of estrogens. *Id.* at 332.

[13] Effexor is used as an antidepressant and antianxiety agent. *Dorland's* at 602, 2074.

plaintiff was reluctant to have treatment until she received Medicaid. (T. 368). Dr. Look considered plaintiff "disease free" from her low-malignant tumor that was completely resected in March 2000. (T. 369).

On December 31, 2002, plaintiff underwent a Behavioral Health Comprehensive Assessment at Samaritan Hospital. (T. 217). Plaintiff presented with depression, anxiety and possible PTSD.[14] (T. 217). Plaintiff was referred to the clinic by Dr. Luz Peguero, plaintiff's primary care physician. (T. 217, 413). Plaintiff reported be depressed with sleep disturbances, fatigue, weight fluctuations, problems concentrating, crying and feelings of helplessness. (T. 217). Plaintiff claimed that she was "panicky" around men because she was raped by her college professor. (T. 217). Plaintiff denied any prior psychiatric treatment. (T. 217). Plaintiff had three children, ages 20, 21 and 27 but stated she had no contact with any other family members. (T. 218). Plaintiff claimed she "was in remission" and taking Effexor, Estazolam and Cenestin.[15] (T. 219). Plaintiff was examined by a clinician and psychiatrist.[16] (T. 220). Plaintiff was diagnosed with major depressive disorder, panic disorder and post traumatic stress disorder. (T. 220). Plaintiff was referred to the outpatient clinic for treatment and scheduled for orientation on January 6, 2003. (T. 220).

On January 10, 2003, plaintiff underwent a bone density study at Seton Health Medical Imaging at the request of Dr. Peguero. (T. 303). The radiologist noted "normal bone density left hip and AP and lateral lumbar spine". (T. 304). On January 17, 2003, plaintiff returned to Dr. Peguero complaining of severe vertigo with vomiting and depression. (T. 214). Dr. Peguero

---

[14] PTSD is an abbreviation for post traumatic stress disorder. http://www.medilexicon.com (last visited September 16, 2008).

[15] Estazolam is used as a sedative and in the hypnotic treatment of insomnia. *Id.* at 656.

[16] The names of the clinician and psychiatrist are illegible.

stated plaintiff had acute labryrinthitis with a vasovagal reflect however, "she doesn't even have tachycardia".[17]  (T. 214).  Dr. Peguero diagnosed plaintiff with near syncope, depression and anxiety and prescribed Valium, Vioxx and Lexapro.[18] (T. 214).

On January 20, 2003, plaintiff returned to Samaritan Hospital's Behavioral Health Services. (T. 287).  A Physician's Progress Note was prepared.[19] (T. 288).  After discussing plaintiff's medical and social history, the physician advised plaintiff to continue with Lexapro and return in 4 weeks. (T. 288).  On February 17, 2003, a second Physician's Progress Note was prepared. (T. 289).  The physician noted that plaintiff had fewer mood swings and was less depressed while taking Lexapro. (T. 289).  Plaintiff stated that her "main problem" was insomnia. (T. 289).  Plaintiff was diagnosed with PTSD with multiple psychosocial stressors and advised to continue with Lexapro. (T. 289).  The doctor also prescribed Trazadone and individual therapy with Dr. Berger.[20]  (T. 289).  On March 17, 2003, the progress note indicated that plaintiff felt her "energy and sleep were "improving". (T. 290).  The physician advised plaintiff to continue with her medications and therapy. (T. 290).  On April 25, 2003, plaintiff advised the physician that her depression was "better" with the medications. (T. 291).  Plaintiff also stated that she slept through the night without nightmares and her concentration was improved. (T. 291).  The physician noted

---

[17] Labyrinthitis is inflammation of the ear canal which may be accompanied by vertigo or hearing loss. *Dorland's* at 1009. Tachycardia is excessive rapidity in the action of the heart (a heart rate over 100 beats per minute). *Id*. at 1890.

[18] Syncope is a temporary suspension of consciousness due to generalized cerebral ischemia; called also faint. *Id.* at 1845.  Valium is used as an antianxiety agent in the treatment of anxiety disorders and for short-term relief of anxiety symptoms, also as a skeletal muscle relaxant, anticonvulsant, antitremor agent or antipanic agent. *Id.* at 519, 2049.  Vioxx is a nonsteroidal anti-inflammatory drug used in the treatment of osteoarthritis or acute pain. *Dorland's* at 1677, 2086.  Lexapro is an antidepressant.  *Id.* at 654, 1047.

[19] The record contains four "Progress Notes"from Samaritan Hospital.  The reports are unsigned and the record does not indicate who prepared the reports.  A complete review of the record reveals that plaintiff was treated by Dr. Norelli, a psychiatrist at Samaritan Hospital.  (T. 217-223).

[20] Trazadone is an antidepressant used to treat major depressive episodes with or without prominent anxiety. *Dorland's* at 1983.

7

plaintiff's depression and PTSD were improved with Lexapro and Trazadone and plaintiff was advised to continue with her treatment. (T. 291).   On May 15, 2003, plaintiff called to advise that her depression had increased due to family stressors. (T. 292).    The physician increased plaintiff's medications and advised her to call for an appointment when she returned from Indiana. (T. 292).

From April 2003 until June 2003, plaintiff had two therapy sessions with Dr. Berger.  (T. 223).  On June 12, 2003, Dr. Berger prepared a handwritten note addressed to plaintiff.  (T. 293). Dr. Berger requested that plaintiff attend an appointment by July 15th in order to maintain services with the clinic.  (T. 293).  Dr. Berger indicated that if plaintiff did not appear by that date, her file would be closed. (T. 293).  On July 16, 2003, plaintiff relocated to Indiana to be with her children and withdrew from the Program. (T. 276).  Plaintiff's discharge summary was completed by Dr. Norelli and Dr. Berger. (T. 277).  The doctors noted plaintiff's final diagnosis was major depression, single episode (moderate). (T. 276).  The doctors noted that plaintiff's condition was "improved" upon discharge. (T. 276).

On September 10, 2003, plaintiff was evaluated by Dr. Edward G. Merzig, a rheumatologist, at the request of Dr. Peguero. (T. 256).  Plaintiff complained of arthritis and joint pain in her neck, shoulders, elbows, wrists, hands, fingers, thorax, back, hips, knees, ankles, feet, toes and heels. (T. 256).  Plaintiff stated the pain lasted for 4 hours and had been present for the last 3-4 years. (T. 256).  Plaintiff claimed that it flared over the last 2 months and that Vioxx provided some benefit and that Methylprednisone improved her symptoms.[21] (T. 256).  Dr. Merzig noted plaintiff smoked 2 packs of cigarettes a day.  (T. 257).  Plaintiff advised Dr. Merzig

---

[21] Methylprednisone is used in replacement therapy for adrenocrotical insufficiency and as an anti-inflammatory and immunosuppressant in a wide variety of disorders. *Dorland's* at 1171.

that she worked full time selling art to support herself but that she was limited with arthritis. (T. 257). Plaintiff stated that she liked to walk and hike outdoors. (T. 257).

Dr. Merzig's examination of plaintiff's extremities was "within normal limits", the musculoskeletal examination showed tenderness and stiffness in various joints and plaintiff's neurological examination was "grossly normal". (T. 258-259). Dr. Merzig diagnosed plaintiff with chronic polyarthritis, depression, obesity, Sicca syndrome/Sjorgen's disease and degenerative disc disease.[22] (T. 259). Dr. Merzig advised plaintiff to reduce her weight with exercise, begin a swim therapy program and prescribed Medrol.[23] (T. 261).

On October 29, 2003, plaintiff returned to Dr. Merzig complaining of pain in her right side which was "worse since running out of Medrol two weeks ago". (T. 262). Dr. Merzig found tenderness in plaintiff's joints with decreased range of motion. (T. 264). Dr. Merzig noted plaintiff had "improved since the previous visit". (T. 264). Dr. Merzig prescribed Plaquenil rather than Medrol.[24] (T. 264).

On December 10, 2003, plaintiff returned to Dr. Merzig complaining of right shoulder and back pain. (T. 266). Dr. Merzig's diagnosis was unchanged and he noted "patient is generally doing well". (T. 268). On February 25, 2004, plaintiff returned to Dr. Merzig complaining that she was "sore all over". (T. 270). Dr. Merzig noted plaintiff had improved and advised her to continue with her medication. (T. 272).

---

[22] Sicca syndrome/Sjorgen's disease is a complex of unknown etiology occurring in middle-aged or older women marked by keratoconjunctivits (inflammation of the cornea), xerostomia (dryness of the mouth) and connective tissue disease, usually rheumatoid arthritis. *Id.* at 994, 1871, 2115.

[23] Medrol is a trademark preparation of methylprednisone. *Id.* at 1137.

[24] Plaquenil is used as an anti-inflammatory disease-modifying rheumatic drug. *Dorland's* at 894,1477

On February 26, 2004, plaintiff returned to Dr. Peguero and stated that she felt better "absent her joint pain". (T. 358).  Dr. Peguero prescribed Wellbutrin.[25] (T. 295).  On May 26, 2004, plaintiff returned to Dr. Peguero and stated that she needed to "talk because her brother killed himself". (T. 357).  Dr. Peguero diagnosed plaintiff with depression and anxiety. (T. 357).

On June 3, 2004, plaintiff returned for an examination with Dr. Merzig who noted plaintiff had "no new medical problems or complaints".  (T. 317).  Dr. Merzig prescribed Methotrexate.[26] (T. 319).  On June 16, 2004, plaintiff returned to Dr. Merzig complaining that her hands, knees and feet were sore but she was "generally better". (T. 313).  Dr. Merzig's diagnosis unchanged and he noted plaintiff had improved from the last visit. (T. 315).   On July 20, 2004, plaintiff stated her hands and feet were sore and she was stiff all over but that she had "no side effects". (T. 321).  Dr. Merzig noted plaintiff's condition was improved. (T. 323).  Dr. Merzig prescribed Azulfidine and advised plaintiff to continue taking Methotrexate.[27]  (T. 324).  On January 13, 2005, plaintiff returned for a follow up visit with Dr. Merzig but had no new medical problems or complaints. (T. 399).  Dr. Merzig noted plaintiff was "doing well". (T. 400).  On February 24, 2005, plaintiff had her last examination with Dr. Merzig.  (T. 401). Dr. Merzig noted plaintiff was "doing better" but "stiff and sore".  (T. 401).  Dr. Merzig noted plaintiff was scheduled for a hernia repair with Dr. Steve Goldstein. (T. 401).   Dr. Merzig concluded plaintiff's condition had improved and advised her to continue with her medications. (T. 402).

---

[25] Wellbutrin is used as an antidepressant and as an aid in smoking cessation to reduce the symptoms of nicotine withdrawal. *Id.* at 265, 2107.

[26] Methotrexate is a folic acid antagonist and used as an antiarthritic in the treatment of severe rheumatoid arthritis.  *Id.* at 1169.

[27] Azulfidine is used in the treatment of rheumatoid arthritis. *Dorland's* at 190, 1828.

On March 11, 2005, plaintiff had her last visit with Dr. Peguero. (T. 397). Plaintiff complained of abdominal pain after surgical repair of her hernia. (T. 397). Dr. Peguero advised plaintiff to call her surgeon. (T. 397). Dr. Peguero diagnosed plaintiff with abdominal pain, distention, anemia and nicotine addiction and advised plaintiff to start a smoking cessation program. (T. 397).

**B.      Consultative Examination**

On June 4, 2003, Gowdara Divakara Murthy, M.D. performed an internal medicine examination of plaintiff at the request of the agency. (T. 243). Dr. Murthy noted plaintiff complained of dizziness, difficulty breathing and depression. (T. 243). Plaintiff advised that she was able to cook meals, clean the house, shop, do laundry, groom, dress and bathe. (T. 244). Plaintiff watched television, read books and listened to the radio. (T. 244). Upon examination, Dr. Murthy noted plaintiff had a normal gait and stance and that plaintiff needed no assistance during the examination. (T. 244). Dr. Murthy noted plaintiff "looks and feels depressed". (T. 244). Dr. Murthy noted that plaintiff had a full range of motion in her cervical and lumbar spine and her grip strength intact. (T. 245). Dr. Murthy diagnosed plaintiff with a history of asthma (stable) and depression. (T. 245). Dr. Murthy opined plaintiff was moderately limited in her ability to lift, push, pull, jump, walk and climb stairs. (T. 246). Dr. Murthy diagnosed plaintiff as "moderately depressed" and suggested a psychological evaluation. (T. 246).

**C.      Residual Functional Capacity ("RFC") Assessments**

On May 21, 2003, Dr. Abdul Hameed prepared a Psychiatric Review Technique. (T. 225). Dr. Hameed assessed plaintiff's complaints based upon 12.04 (Affective Disorders) and 12.06 (Anxiety-Related Disorders). (T. 225). Dr. Hameed noted plaintiff had no restriction in activities

11

of daily living, mild restrictions in maintaining social functioning, moderate restrictions with maintaining concentration, persistence or pace and no episodes of decompensation. (T. 235).

Dr. Hameed also prepared a Mental RFC Assessment. (T. 239). Dr. Hameed noted plaintiff displayed no evidence of limitation in remembering locations and opined that plaintiff was "not significantly limited" in her ability to understand and remember instructions. (T. 239). Dr. Hameed found that plaintiff was moderately limited in her ability to maintain attention for extended periods and to sustain an ordinary routine and moderately limited in her ability to complete a normal workday. (T. 239-240). Dr. Hameed opined that plaintiff was independent in her activities of daily living and could understand instructions, remember and carry out work related tasks. (T. 241).

On June 13, 2003, a state agency non-examining disability analyst prepared a Physical RFC.[28] (T. 247). The analyst noted that plaintiff's primary diagnosis was asthma and secondary diagnosis was abdominal hernia. (T. 247). The analyst found that plaintiff could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk and sit for 6 hours in an 8 hour workday. (T. 247). The analyst also found that plaintiff was not limited in her ability to push and pull. (T. 247). The analyst found plaintiff's claim that she was unable to lift heavy objects to be "partially credible" but stated that plaintiff's claim that she could not stand/walk for long periods of time was "totally non-credible". (T. 250).

## III.    PROCEDURAL HISTORY

On August 30, 2002, plaintiff filed applications for disability insurance benefits ("DIB") and supplemental security income benefits ("SSI"). (T. 72, 380). On January 21, 2003, the applications were denied. (T. 30, 385). Plaintiff's request for reconsideration was rejected on

---

[28] The name of the analyst is illegible.

June 13, 2003. (T. 35, 390). Plaintiff requested a hearing which was held before an

Administrative Law Judge ("ALJ") on July 23, 2004.[29] (T. 19). On November 3, 2004, ALJ

Thomas P. Zolezzi issued a decision denying plaintiff's claims for benefits. (T. 19-26). On July

26, 2006, the Appeals Council denied plaintiff's request for a review, rendering the ALJ's

decision the final determination of the Commissioner. (T. 7). Exhausting all her options for

review through the Social Security Administration's tribunals, plaintiff brings this appeal. (Dkt.

No. 1).

## IV.    ADMINISTRATIVE LAW JUDGE'S DECISION

The Social Security Act (the "Act") authorizes payment of disability insurance benefits to

individuals with "disabilities." The Act defines "disability" as the "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment . . . which has lasted or can be expected to last for a continuous period of not less than

12 months." 42 U.S.C. § 423(d)(1)(A). There is a five-step analysis for evaluating disability

claims:

> "In essence, if the Commissioner determines (1) that the claimant is not working, (2)
> that he has a 'severe impairment,' (3) that the impairment is not one [listed in
> Appendix 1 of the regulations] that conclusively requires a determination of disability,
> and (4) that the claimant is not capable of continuing in his prior type of work, the
> Commissioner must find him disabled if (5) there is not another type of work the
> claimant can do." The claimant bears the burden of proof on the first four steps, while
> the Social Security Administration bears the burden on the last step.

*Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003) (quoting *Draegert v. Barnhart*, 311

F.3d 468, 472 (2d Cir. 2002)); *Shaw v. Chater*, 221 F.3d 126, 132 (2d Cir. 2000) (internal

citations omitted).

---

[29]    On October 7, 2004, a supplemental hearing was held for the purposes of obtaining testimony from a
vocational expert. (T. 58).

In this case, the ALJ found at step one that plaintiff has not engaged in substantial gainful activity since her alleged onset date. (T. 20). At step two, the ALJ concluded that plaintiff had "severe polyarthritis, multiple hernias, s/p ovarian tumor, r/o Sicca syndrome/Sjogren's disease, obesity and depression". (T. 24). At the third step of the analysis, the ALJ determined that plaintiff's impairments did not meet or equal the severity of any impairment listed in Appendix 1 of the Social Security Regulations (the "Regulations"). (T. 24). At the fourth step, the ALJ found that plaintiff had the RFC to:

> perform the physical exertion and nonexertional requirements of work except for work requiring that she be alone with males for an extended period of time more than 15 minutes, work requiring climbing, heights or ladders, work involving interaction with the public or work requiring more than occasional ability to carry out detailed instructions or work involving concentrated exposure to fumes, owners [sic], dust, gas or poor ventilation. (T. 24-25).

Accordingly, the ALJ concluded that plaintiff was no longer able to perform her past relevant work. (T. 25). Since plaintiff was precluded from performing a full range of light work due to her "environmental restrictions and mental limitations", the ALJ obtained the testimony of a vocational expert to determine whether there were jobs plaintiff could perform. (T. 25). Based upon the vocational expert's testimony, the ALJ concluded at step five, that there were a significant number of jobs in the regional and national economy that plaintiff could perform, such as calculating machine operator, assembler of small products, work as an addresser and surveillance systems monitor. (T. 23). Therefore, the ALJ concluded that plaintiff was not under a disability as defined by the Social Security Act. (T. 25).

## V.    DISCUSSION

A Commissioner's determination that a claimant is not disabled will be set aside when the factual findings are not supported by "substantial evidence." 42 U.S.C. § 405(g); *see also Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000). Substantial evidence has been interpreted to mean

"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* The Court may also set aside the Commissioner's decision when it is based upon legal error. *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999).

In seeking federal judicial review of the Commissioner's decision, plaintiff argues that: (1) the ALJ's decision regarding plaintiff's credibility was improper; (2) the ALJ's RFC determination is not supported by substantial evidence; and (3) the ALJ relied upon the vocational expert's response to a defective hypothetical and thus, the Commissioner did not sustain his burden of proof at step five of the sequential evaluation process. (Dkt. No. 7).

### A.     Credibility

Plaintiff argues that her "credible statements regarding her severe physical, postural, non-exertional and psychological limitations are fully supported by the credible and reliable medical evidence in the record".[30] (Dkt. No. 7, p. 11). The Commissioner claims that the ALJ acknowledged that objective findings supported some of plaintiff's complaints however, her complaints were overstated in light of the medical evidence and her description of her daily activities. (Dkt. No. 11, p. 7).

It is well settled that "a claimant's subjective evidence of pain is entitled to great weight where . . . it is supported by objective medical evidence". *Simmons v. U.S.R.R. Retirement Bd.*, 982 F.2d 49, 56 (2d Cir. 1992) (citations omitted). "Objective medical evidence is evidence obtained from the application of medically acceptable clinical and laboratory diagnostic techniques." *Casino-Ortiz v. Astrue*, 2007 WL 2745704, at *11, n. 21 (S.D.N.Y. 2007) (citing 20 C.F.R. § 404.1529(c)(2)). A claimant's subjective symptoms must be supported by medical signs or conditions that reasonably could be expected to produce the disability or alleged symptoms

---

[30] Plaintiff cites to no legal authority to support this argument. Plaintiff does not provide any specific argument and makes no claim that any specific Regulation or rule of law was misapplied by the ALJ.

based on a consideration of all the evidence. *Pareja v. Barnhart*, 2004 WL 626176, at *10 (S.D.N.Y. 2004).

If plaintiff's testimony concerning the intensity, persistence or functional limitations associated with her pain is not fully supported by clinical evidence, the ALJ must consider additional factors in order to assess that testimony, including: 1) daily activities; 2) location, duration, frequency and intensity of any symptoms; 3) precipitating and aggravating factors; 4) type, dosage, effectiveness and side effects of any medications taken; 5) other treatment received; and 6) other measures taken to relieve symptoms. 20 C.F.R. §§ 404.1529(c)(3)(i)-(vi).

After considering plaintiff's subjective testimony, the objective medical evidence, and any other factors deemed relevant, the ALJ may accept or reject claimant's subjective testimony. *Martone v. Apfel*, 70 F. Supp.2d 145, 151 (N.D.N.Y. 1999); *see also* 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4). An ALJ rejecting subjective testimony must do so explicitly and with specificity to enable the Court to decide whether there are legitimate reasons for the ALJ's disbelief and whether his decision is supported by substantial evidence. *Melchior v. Apfel*, 15 F.Supp.2d 215, 219 (N.D.N.Y. 1998) (quoting *Brandon v. Bowen*, 666 F.Supp 604, 608 (S.D.N.Y. 1987)) (citations omitted). The ALJ retains discretion to assess the credibility of a claimant's testimony regarding disabling pain and "to arrive at an independent judgment, in light of medical findings and other evidence, regarding the true extent of the pain alleged by the claimant." *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979); *Snell v. Apfel*, 177 F.3d 128, 135 (2d Cir. 1999) (holding that an ALJ is in a better position to decide credibility).

In this matter, the ALJ noted that plaintiff complained of fatigue, dryness in her eyes, depression over her physical condition and arthritis which caused extreme pain in her neck and back. (T. 21-22). The ALJ concluded that plaintiff's "subjective complaints are somewhat

overstated in light of the unremarkable medical findings and her own description of her daily activities". (T. 24).  Having reviewed the record, this Court is satisfied that the ALJ utilized the proper legal standards in his analysis of plaintiff's complaints of pain.  Further, the Court finds that there is substantial evidence to support the ALJ's decision to discredit plaintiff's complaints of disabling pain.

The ALJ noted that objective findings and clinical findings including a bone density study and laboratory studies were normal. (T. 23).  The ALJ referenced plaintiff's testimony regarding her daily activities and abilities and noted plaintiff was able to drive, shop, clean, do laundry, change beds and cook. (T. 22, 24).  The ALJ also stated that plaintiff enjoyed doing artwork, used a computer, watched television and read. (T. 22, 24).  In addition to the testimony cited by the ALJ, plaintiff also stated that she performed light housework (sweeping, dusting and doing dishes) and "went outside 2-3 times a week with a friend". (T. 110-114).

The ALJ properly assessed the remaining factors enumerated in 20 C.F.R. §§ 404.1529(c)(3)(i)-(vi).  The ALJ noted that plaintiff used drops for dryness in her eyes and stated that plaintiff "is on hydrochlorothiazide and methotrexate which bothers her stomach, but helps to some degree". (T. 21).  Although plaintiff testified that her medication made her "tired and sluggish" (T. 22), a review of the record reveals that plaintiff never raised these concerns with her physicians.  *See Martin v. Barnhart*, 2008 WL 365727, at *5 (N.D.N.Y. 2008) (no information was contained in the plaintiff's medical evidence that she reported to her physicians, including State agency examining physician extreme fatigue as a side effect of her medications).  Dr. Merzig prescribed Methotrextate in June 2004 for plaintiff's arthritis. (T. 319).  Plaintiff had three subsequent visits with Dr. Merzig and specifically advised Dr. Merzig that she had "no side

effects" from the medication. (T. 323). Indeed, Dr. Merzig renewed plaintiff's prescription for the medication after each visit. (T. 324).

The ALJ also stated that plaintiff's "hernias have gone untreated" and "[s]he had never been involved in outpatient or inpatient psychiatric treatment" prior to December 2002. (T. 20, 22). The ALJ noted the inconsistent nature of plaintiff's complaints and statements. Specifically, the ALJ noted that pursuant to Dr. Merzig's September 2003 records, plaintiff "was engaged in full-time artwork which she sold to support herself but was somewhat limited by arthritis". (T. 22).

Accordingly, the Court finds that the ALJ properly assessed the factors enumerated in 20 C.F.R. § 404.1529(c)(3)(i)-(vi) and § 416.929(c)(3)(i)-(vi). Because the ALJ's credibility analysis and factual findings are based on application of the proper legal principles, the Court may not examine the evidence and substitute its own judgment for that of the Commissioner. 42 U.S.C. § 405(g); *see also Parker v. Harris*, 626 F.2d 225 (2d Cir. 1980).

### B.    RFC Assessment

Plaintiff claims that the RFC analysis was "founded upon numerous reversible errors".[31]

(Dkt. No. 7, p. 13). Residual functional capacity is:

> "what an individual can still do despite his or her limitations . . . . Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule."

*Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96-8p, Policy Interpretation Ruling Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims ("SSR 96-8p"), 1996 WL 374184, at *2 (S.S.A. July 2, 1996)). In making a residual functional capacity determination,

---

[31] Plaintiff does not cite to any legal authority in support of this argument.

18

the ALJ must consider a claimant's physical abilities, mental abilities, symptomology, including pain and other limitations which could interfere with work activities on a regular and continuing basis.  *See* 20 C.F.R. § 404.1545(a)**.**

In this case, the ALJ found that plaintiff had the RFC to:

perform the physical exertion and nonexertional requirements of work except for work requiring that she be alone with males for an extended period of time more than 15 minutes, work requiring climbing, heights or ladders, work involving interaction with the public or work requiring more than occasional ability to carry out detailed instructions or work involving concentrated exposure to fumes, owners [sic], dust, gas or poor ventilation.  (T. 24-25).

Plaintiff argues that:

"[t]he agency did not make a proper determination with regard to the claimant's statements and allegations of daily, severe neck, back and sacroiliac joint, and bilateral upper and lower extremity pain, the chronic swelling and weakness in the joints of her body, and her chronic fatigue".[32] (Dkt No. 7, p. 10).

The Court finds plaintiff's objection to be lacking.  Although plaintiff contends that the ALJ failed to consider her statements, plaintiff offers no support for that allegation.  As previously discussed, the ALJ properly assessed plaintiff's credibility.  Furthermore, substantial evidence exists to support the ALJ's RFC assessment.  In determining plaintiff's RFC, the ALJ "gave consideration" to Dr. Merzig's opinions.[33] (T. 23-24).  Dr. Merzig was the only doctor who provided treatment for plaintiff's complaints of neck, back, extremity and joint pain.  (T. 256).  During plaintiff's initial evaluation, Dr. Merzig noted that plaintiff's extremities were "within normal limits" and plaintiff's neurological examination was "grossly normal". (T. 258-259).   Dr. Merzig's treatment records repeatedly indicate that plaintiff was "generally better" and "improved" after each visit.  (T. 313-324; 399-402).  Moreover, Dr. Merzig's opinions were

---

[32] The Court notes that plaintiff's arguments regarding the ALJ's RFC determination are vague.  Plaintiff does not argue that the ALJ violated or misapplied any Regulation(s) or otherwise committed legal errors.

[33] Plaintiff does not object to the ALJ's assessment of Dr. Merzig's opinion.

consistent with objective and clinical testing and the opinions of other physicians. Dr. Murthy

noted that plaintiff's only complaints were "feeling dizzy, difficulty breathing and depression".

(T. 243). Dr. Murthy noted that plaintiff's musculoskeletal examination was normal with full

range of motion and grip strength. (T. 245). Dr. Murthy concluded that plaintiff was "moderately

limited in her ability to lift, push, pull, jump up and down, and walk and go up and down stairs".[34]

(T. 246). Therefore, the Court finds that substantial evidence supports the ALJ's RFC assessment

in regard to plaintiff's exertional limitations.

Plaintiff also argues that the ALJ failed "to properly consider [plaintiff's] chronic

depression and anxiety with agoraphobia and an inability to interact independently with men".

(Dkt. No. 7, p. 10-11). The Court finds this objection to be without merit. The record does not

contain any mention, discussion or diagnosis of agoraphobia by any treating or consulting

physician. Moreover, the ALJ specifically considered plaintiff's depression and inability to

interact with men and incorporated those limitations into the RFC assessment. (T. 24). The ALJ

discussed Dr. Hameed's functional evaluation in the context of plaintiff's non-exertional

limitations.[35] (T. 21). The ALJ also noted that plaintiff had been treated for depression however,

the ALJ stated that "it does not appear that it has had a clinically disabling effect on her". (T. 24).

Substantial evidence in the record supports this conclusion.

In June 2003, plaintiff was discharged from Samaritan Hospital's Mental Health Clinic.

(T. 276). Upon discharge, plaintiff's physicians noted that she had "improved". (T. 276).

Plaintiff did not seek further treatment from any psychologist or psychiatrist for mental health

concerns. The record does not include any functional evaluations of plaintiff's mental

---

[34] Plaintiff does not object to the ALJ's assessment of Dr. Murthy's opinions.

[35] Plaintiff does not object to the ALJ's assessment of Dr. Hameed's opinions.

impairments by any treating physician or source.  To the contrary, there is substantial evidence in the record to suggest that plaintiff did not have a disabling mental condition.  *See Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998).  Thus, the Court finds that the ALJ properly assessed plaintiff's mental impairments and determined that plaintiff's depression and "inability to interact with men" did not significantly limit her ability to perform work-related activities.

## C.      Vocational Expert

Plaintiff argues that the ALJ failed to "accurately present" plaintiff's significant limitations to the vocational expert in the hypothetical questions.  (Dkt. No. 7, p. 14).  The Commissioner argues that the hypothetical presented to the expert was properly based on the ALJ's "well supported assessment of plaintiff's RFC". (Dkt. No. 11, p. 16).

At the fifth step of the sequential evaluation of disability, the Commissioner bears the responsibility of proving that plaintiff is capable of performing other jobs existing in significant numbers in the national economy in light of plaintiff's residual functional capacity, age, education, and past relevant work.  20 C.F.R. §§ 416.920, 416.960.  Ordinarily, the Commissioner meets his burden at this step "by resorting to the applicable medical vocational guidelines (the grids), 20 C.F.R. Pt. 404, Subpt. P, App. 2 (1986)."  *Bapp v. Bowen*, 802 F.2d 601, 604 (2d Cir. 1986).  Sole reliance on the grids is inappropriate where the guidelines fail to describe the full extent of a claimant's limitations.  *Id*. at 606.  For example, use of the grids as the exclusive framework for making a disability determination may be precluded where plaintiff's physical limitations are combined with non-exertional impairments which further limit the range of work she can perform.  *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996).  In these circumstances, the Commissioner must "introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which claimant can obtain and perform."  *Bapp*, 802 F.2d at 603;

21

*see also Melchior v. Apfel*, 15 F. Supp. 2d 215, 58 (N.D.N.Y. 1998) (stating "where nonexertional

limitations significantly diminish the ability to perform a full range of work, it is appropriate that

the ALJ present testimony from a vocational expert").

A hypothetical question that does not present the full extent of a claimant's impairments

cannot provide a sound basis for vocational expert testimony. *Bosmond v. Apfel*, 1998 WL

851508, at *8 (S.D.N.Y. 1998) (citation omitted); *see also De Leon v. Secretary*, 734 F.2d 930,

935 (2d Cir. 1984).  If a hypothetical question does not include all of a claimant's impairments,

limitations and restrictions, or is otherwise inadequate, a vocational expert's response cannot

constitute substantial evidence to support a conclusion of no disability. *Melligan v. Chater*, 1996

WL 1015417, at *8 (W.D.N.Y. 1996).

In this case, the ALJ presented the following hypothetical to the vocational expert:

> Any job that she had would be one where she would not be required to be alone with
> males for any extended period of time, no more than, say, 10 minutes with someone,
> with a male.  It must be one where she does no climbing, there are no heights, no
> ladders.  She can do occasional, but no frequent requirement [sic] to carry out
> detailed instructions.  The job must not require her to be in any area where there are
> concentrated fumes, gases, odors, or poor ventilation or dust.  It must be one where
> she could change positions as needed, say every 15 to 20 minutes, using a sit/stand
> option.  It must be one where there should be no complex decision-making. . . One
> where there should be little or no interaction with the public, and, finally occasional
> but not frequent interaction with coworkers.  She can work in proximity with them,
> but only occasionally in coordination or conjunction with coworkers.  (T. 415).

The vocational expert responded that a person with this set of assumptions could perform several

jobs, including calculating machine operator, assembler of small products, addresser and

surveillance system monitor . (T. 416-418).   As previously discussed, the ALJ's RFC assessment

was based upon substantial evidence.  The hypothetical presented to the expert contains the same

limitations and restrictions contained in the RFC assessment.  Therefore, the Court finds that the

hypothetical submitted to the vocational expert is supported by substantial evidence.

Accordingly, the ALJ properly relied upon the expert's response to the hypothetical to determine that there were jobs within the region that plaintiff could perform.

**VI.    CONCLUSION**

For the foregoing reasons, it is hereby

**ORDERED** that the decision denying disability benefits is **AFFIRMED**; and it is further

**ORDERED** that the defendant's motion for judgment on the pleadings is **GRANTED**; and it is further

**ORDERED** that pursuant to General Order # 32, the parties are advised that the referral to a Magistrate Judge as provided for under Local Rule 72.3 has been rescinded, as such, any appeal taken from this Order will be to the Court of Appeals for the Second Circuit; and it is further

**ORDERED** that the Clerk of Court enter judgment in this case.

**IT IS SO ORDERED.**

Dated: September 23, 2008
        Syracuse, New York

Norman A. Mordue
Chief United States District Court Judge